IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PARALLEL IRON, LLC,

    Plaintiff,

v.

ADOBE SYSTEMS INCORPORATED,

    Defendant.

C.A. No. 12-874-RGA

## MEMORANDUM OPINION

Richard D. Kirk, Esq., Wilmington, Delaware; Marc A. Fenster, Esq., Los Angeles, California (argued); Attorneys for Plaintiff Parallel Iron, LLC.

Richard L. Horwitz, Esq., Wilmington, Delaware; Robert J. Artuz, Esq., Menlo Park, California (argued); Attorneys for Defendant Adobe Systems Incorporated.

March 4, 2013
Wilmington, Delaware

*/s/ Richard G. Andrews*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Parallel Iron, LLC brings a patent infringement action (D.I. 1) against Defendant Adobe Systems Incorporated. Parallel Iron alleges that Adobe infringed U.S. Patent Nos. 7,197,662, 7,543,177, and 7,985,388.[1] Adobe now moves to disqualify Parallel Iron's lead counsel, the law firm of Russ August & Kabat ("RAK"). Adobe argues that RAK was serving as its opinion counsel at the time Parallel Iron filed suit, thus creating an impermissible concurrent conflict of interest.

## FACTUAL BACKGROUND

RAK filed suit against Adobe on behalf of Parallel Iron on July 12, 2012. (D.I. 1). On September 4, 2012, Adobe sent RAK a letter asserting that RAK "currently advises Adobe on patent matters" and that a concurrent conflict of interest existed based on this dual representation. (D.I. 23, ¶ 25). This alleged conflict of interest is grounded in three previous engagements between RAK and Adobe involving the preparation of opinion letters. (*Id.* at ¶ 2). These letters represent the full scope of the legal work performed by RAK for Adobe, as RAK never served as litigation or trial counsel. (*Id.*). Marc A. Fenster, a partner at RAK, was responsible for the opinion letters and the client relationship with Adobe. (D.I. 15, ¶¶ 3-4).

The first engagement began in April 2006. (D.I. 23, ¶ 4). Mr. Fenster agreed to provide an opinion on whether Adobe's Excellence products infringed U.S. Patent No. "1", a patent held by a company known as Tech, Inc.[2] (*Id.*). Mr. Fenster was to deliver the final opinion letter with

---

[1] Parallel Iron has filed numerous related cases in the District of Delaware asserting the same patents against other parties.

[2] In order to make sure no confidential information is disclosed, the Court has used pseudonyms as the Court thinks appropriate.

1

an oral presentation to an Adobe "business unit leader." (*Id.*). Mr. Fenster conducted the infringement analysis and had related telephone conversations with Adobe personnel. (*Id.* at ¶ 5). He delivered his opinion letter of non-infringement to Adobe in October 2006. (*Id.*). This did not conclude Mr. Fenster's engagement on Tech related work, as Adobe engaged him for additional infringement analysis of Adobe's Excelsior product and the Tech patent in May 2007. (*Id.* at ¶ 6). Mr. Fenster did this analysis and delivered his final opinion letter of non-infringement in October 2007, which he orally presented in January 2008. (*Id.* at ¶¶ 6-7).

RAK's next engagement with Adobe began in May 2009. (*Id.* at ¶ 8). This was to provide an opinion letter as to whether Adobe's Excalibur product infringed U.S. Patent No. "2," a patent held by a company known as Services, Inc. Mr. Fenster again performed the infringement analysis and determined that the product did not infringe the patent. (*Id.*). The letter was delivered in July 2009, and was orally presented to Adobe in August 2009. (*Id.*). This concluded RAK's work for Adobe on the Services patent.

Adobe next engaged RAK in August 2010 for an opinion letter regarding whether Adobe's Extreme product infringed U.S. Patents Nos. "3" and "4," held by a company known as Manufacturers LLC. (*Id.* at ¶ 10). Mr. Fenster did the infringement analysis and concluded that Adobe's Extreme product did not infringe the Manufacturers' patents. (*Id.*). The opinion letter was drafted in April 2011 and the opinion was discussed in May 2011. (*Id.* at ¶ 11). During the discussion, Adobe informed RAK that Manufacturers had a third patent, U.S. Patent No. "5," and Mr. Fenster agreed to perform an infringement analysis in relation to this patent. (*Id.*). A revised opinion letter was sent to Adobe in October 2011, which included an analysis of the third Manufacturers patent. (*Id.*). This was discussed in November 2011, at which time Adobe in-house personnel requested certain revisions. (*Id.* at ¶ 12). In December 2011, Mr. Fenster

2

delivered two final opinion letters of non-infringement to Adobe, which were then orally presented in February 2012 during a conference call. (*Id.* at ¶ 13). Mr. Fenster avers that he asked whether any additional work was needed or requested by Adobe at that time, to which Adobe in-house personnel replied in the negative. (*Id.*). Mr. Martini, the Adobe declarant, avers that neither he nor anyone else at Adobe ever communicated an intention to terminate the relationship with RAK. (D.I. 15, ¶ 8). He further avers that Adobe expected at all times that it would be able to continue to rely on RAK as opinion counsel in the ongoing Manufacturers matter. (*Id.* at ¶ 4). Adobe's dispute with Manufacturers is ongoing as of Mr. Martini's November 1, 2012 declaration, and RAK never actually notified Adobe that it would be unavailable to provide further opinion letter work on the Manufacturers matter. (*Id.* at ¶ 16).

Mr. Fenster avers that for each opinion letter, Adobe and RAK came to an agreed upon budget range and limited the scope of the relationship to an infringement analysis of the subject patent and products identified by Adobe, which would be embodied in an opinion letter. (D.I. 23, ¶ 16). RAK was never engaged as litigation or trial counsel. (*Id.* at ¶ 17). In July 2012, five months subsequent to the delivery of the most recent Manufacturers opinion letter, Parallel Iron engaged RAK to file suit against Adobe. (*Id.* at ¶ 22).

## DISCUSSION

The American Bar Association Model Rules of Professional Conduct govern attorneys practicing in the District of Delaware. *Boston Scientific Corp. v. Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 373 (D. Del. 2009). When an attorney is alleged to breach the Model Rules, the court must "examine the charge." *Webb v. E.I. Du Pont de Nemours & Co., Inc.*, 811 F. Supp. 158, 160 (D. Del. 1992). The Court has the power to disqualify attorneys and law firms for

3

violation of the Model Rules. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). Nevertheless, motions to disqualify are generally disfavored. *Intellectual Ventures I LLC v. Checkpoint Software Technologies Ltd.*, 2011 WL 2692968, *4 (D. Del. 2011). "[T]he court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule." *Miller*, 624 F.2d at 1204. "[D]isqualification is never automatic," *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 583 (D. Del. 2001), and the Court has "wide discretion in framing its sanctions to be just and fair to all parties involved." *Miller*, 624 F.2d at 1201.

Adobe argues that RAK should be disqualified for a breach of Model Rule 1.7(a). Rule 1.7(a) provide that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest" absent client consent.[3] Parallel Iron argues that there was no active attorney-client relationship between Adobe and RAK at the time it filed suit. "Under Delaware law, where there is no express contract or formal retainer agreement evidencing an attorney-client relationship, courts look at the contacts between the potential client and its potential lawyers to determine whether it would have been reasonable for the client to believe that the attorney was acting on its behalf as counsel." *Boston Scientific Corp.*, 647 F. Supp. 2d at 373.[4]

The determination of whether an attorney-client relationship exists thus requires a client-centric focus. The analysis depends on the reasonableness of the client's belief regarding the status of the relationship. This requires a fact specific inquiry that depends on the client's history

---

[3] There is no dispute that Adobe never consented to being sued by RAK.

[4] The Model Rules take a stricter approach to concurrent conflict of interest as opposed to conflicts involving former clients. *See Commonwealth Scientific & Indus. Research Organisation v. Toshiba Am. Info. Sys., Inc.*, 297 F. App'x 970, 974 (Fed. Cir. 2008).

4

with the law firm. Here, the six year history between Adobe and RAK was sufficient to instill in Adobe a reasonable belief that it would not be sued by RAK, at least absent some sort of prior notice that RAK would no longer be available to serve as Adobe's opinion counsel. It was fair for Adobe to believe that its opinion counsel would not transform into adverse counsel without warning. RAK knew of the active nature of the Manufacturers engagement, as it billed time for "Research dockets of prior and new Manufacturers patent infringement cases in [State]" in June 2011. (D.I. 15, Exh. I at 3). Developments in that litigation, including claim construction, would certainly bear on RAK's infringement analysis. RAK should thus have expected that Adobe would desire to rely on RAK's experience with the Manufacturers patents to provide any needed updates, just as had occurred during the Tech engagement. The Court is aware of the limited nature of the opinion counsel role. Nevertheless, opinion counsel is still counsel, complete with fiduciary duties to clients and professional obligations under the Model Rules.

It is true that RAK would have been free to reject any Adobe request for further opinion letters. RAK, however, had never refused work from Adobe in the past, which strengthens the reasonableness of Adobe's belief that RAK would take further work and the relationship was ongoing. Moreover, RAK's freedom to reject additional work from Adobe is not dispositive. Even the most active of attorney-client relationships may be terminated at the option of the attorney so long as "withdrawal can be accomplished without material adverse effect on the interests of the client[.]" ABA Model R. Prof. Conduct 1.16(b). The fact that the law firm, however, may freely choose to end the relationship and refuse further business does not mean it is free to sue its client prior to making it clear that the relationship is over. It is the law firm's responsibility to ensure there are no questions regarding the status of its current client relationships. *Baldasarre v. Butler*, 132 N.J. 278, 291, 625 A.2d 458, 464 (1993). It would have

been a simple enough task for RAK to notify Adobe that it would no longer be available as opinion counsel. Although the Court has no reason to believe that RAK acted in bad faith, or anything approaching bad faith, it is incumbent upon law firms to iron out risks of conflicts before the risks mature into live controversies.

Parallel Iron refers to Adobe's "Guidelines for Handling All Matters" as evidence that Adobe itself sharply limited the scope of the relationship, and thus could not have reasonably believed it was still a client of RAK:

> The purpose of this letter is to set forth guidelines that will govern your firm's provision of legal services to Adobe Systems Incorporated and its subsidiaries ("Adobe"), not only with respect to the matters for which you are presently engaged, but also with respect to any other matters for which Adobe may engage you in the future.
>
> . . . .
>
> **Engagement for Projects May Only Be Made by Adobe legal department**: Finally, please note that only representatives of the Adobe legal department may assign projects to you or engage your firm's services. If requests for services are made by any other persons within Adobe (and are not otherwise authorized by the Adobe legal department contact), you should consult your Adobe legal department contact before proceeding with the work. Unauthorized work will be ineligible for payment.

(D.I. 23, Exh. J at 1, 3). The Court does not view the Guidelines as an important source of guidance for the Rule 1.7(a) analysis. They focus on defining who is authorized to bind Adobe to agreements for legal services. The question here is not whether RAK engaged with Adobe personnel who lacked authority to bind the organization. Adobe authorized RAK to perform all of the services RAK performed as opinion counsel. The question is whether the history between RAK and Adobe made it such that Adobe reasonably believed that a relationship existed and that it would expect not to be sued by an RAK-represented party. Parallel Iron argues that the Guidelines do not mention or require formal notice of termination, but neither do the Guidelines

6

amend the Rules of Professional Responsibility. Finally, Parallel Iron argues that at the end of the last conference call between Mr. Fenster and Adobe personnel, Mr. Fenster asked whether anything further was needed from RAK, and Adobe personnel responded in the negative. According to Parallel Iron, this terminated the attorney-client relationship. The Court disagrees. Such a customary gesture to conclude a conversation is not sufficient to terminate Adobe's expectations. For all these reasons, the Court holds that RAK had an ongoing attorney-client relationship at the time it filed suit on behalf of Parallel Iron against Adobe, and that RAK thus created a prohibited concurrent conflict of interest under Rule 1.7(a).

The question remains: what to do about RAK's violation? Adobe argues that (1) RAK should be disqualified from this case and (2) RAK should be forced to build an "ethical wall" between itself and co-counsel. The Court agrees with the first proposal, and disagrees with the second. "Because the interest sought to be protected by Rule 1.7 is one of loyalty, a *per se* rule of disqualification should be applied when that rule is breached." *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 195 (D.N.J. 1989). Law firms must be aware of the importance of conducting thorough conflict analyses, especially when filing multiple suits against dozens of defendants. When it became apparent to RAK that Adobe was a tenable target of Parallel Iron's patent suit, RAK should have been more alert to the delicateness of the situation and been more proactive in extinguishing any questions regarding the existence and extent of the Adobe relationship. RAK is thus disqualified from further representing Parallel Iron in its suit against Adobe.

The Court does not find it necessary to force RAK to build an "ethical wall" between itself and co-counsel. The Court has no reason to believe that RAK operated in bad faith when it sued Adobe. There is thus no reason to believe that RAK will not comply with the

7

disqualification order by "continuing to litigate against Adobe indirectly, by directing [] Parallel Iron's other lawyers at the Ni law Firm and Bayard P.A., who are its co-counsel in both this lawsuit and the other Parallel Iron actions." (*Adobe's Brief*, D.I. 13, p. 17). The complete bar of communication between RAK and co-counsel would seriously hamper RAK's ability to litigate on behalf of Parallel Iron in the other actions. This would result in considerable disruption and disproportionate punishment, considering the lack of RAK's bad faith or Parallel Iron's complicity in the conflict. Further, RAK is not in possession of any confidential information that is relevant to the instant suit. There is thus no need to order RAK to set up an "ethical wall" between itself and co-counsel.

The Court has no reason to believe that RAK will not faithfully comply with the disqualification order. The Court therefore does not believe any further action is necessary.

An order will follow.